[Cite as *State v. Warren*, 2019-Ohio-3522.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28092 |
| | : | |
| v. | : | Trial Court Case No. 1994-CR-3533 |
| | : | |
| RAYMOND WARREN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of August, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JOANNA L. SANCHEZ, Atty. Reg. No. 0087717, and PATRICK T. CLARK, Atty. Reg. No. 0094087, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Raymond Warren, appeals from the order of the Montgomery County Court of Common Pleas overruling his motion for leave to file a motion for new trial. Specifically, Warren contends that the trial court abused its discretion in finding that: (1) the evidence on which his motion for leave was based was not new evidence that he was unavoidably prevented from discovering; and (2) the delay in filing his motion for leave was unreasonable. Warren also contends that, at the evidentiary hearing on his motion for leave, the trial court abused its discretion by excluding expert testimony regarding psychological pressures that lead to delayed recantations in adolescents. Warren further contends that the trial court abused its discretion in overruling his motion for public records under R.C. 149.43(B)(8). For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On April 4, 1995, a jury found Warren guilty of one count of murder with an accompanying firearm specification. The trial court sentenced Warren to 15 years to life in prison on the murder charge and three additional years in prison on the firearm specification. In issuing its sentencing decision, the trial court ordered the three-year sentence for the firearm specification to be served consecutive and prior to the indefinite term of prison that Warren received for murder, making his total prison sentence 18 years to life. Warren thereafter appealed from his conviction, which this court affirmed in *State v. Warren*, 2d Dist. Montgomery No. 15202, 1996 WL 612858 (Oct. 25, 1996) ("*Warren I*").

{¶ 3} In *Warren I*, this court found that the evidence at trial established the following facts.

Shortly after midnight on July 10, 1994, Wendell Scott Simpson was shot three times in his automobile on Kilmer Street in Dayton. Moments later, his automobile crashed into the porch of a house on Kilmer. Simpson died as a result of his gunshot wounds.

Police officers who responded to the scene of the crash received information from a resident of Kilmer Street that Simpson had been seen talking with three young black men on mopeds shortly before the shooting. Approximately an hour after police officers had arrived at the scene, Warren drove down Kilmer Street toward the accident on a moped. Because Warren matched the general description of the young men who were last seen talking with Simpson, Sergeant Larry Grossnickle stopped Warren and asked him if he would be willing to answer some questions. Warren agreed. After answering questions briefly at the scene, Warren was taken to the police station to make a statement.

At the police station, a police evidence technician administered an atomic absorption test ("AA test") on Warren's hands to detect the presence of antimony and barium. The presence of these two uncommon substances on one's hands indicates a high probability that the person has fired a gun, has handled a gun which was fired, or has been "down range" of a weapon which was fired within the previous two to four hours. The police later learned that Warren's right palm had tested positive on the AA

test for both substances.

Warren was also interviewed at the police station by Detective Doyle Burke. Warren told Burke that he and two of his friends, whom he identified only as "Tony" and "Chante," had been walking up Kilmer pushing a moped at around midnight on July 10. Warren stated that a green car had pulled up to them and that the driver had asked about purchasing drugs. "Tony" responded that they did not sell drugs, and the group proceeded up the street. According to Warren, the young men heard gunshots and a crash a few minutes later. Warren was released after making his statement.

Approximately one month after the shooting, police identified and located the two young men who had been with Warren on July 10. "Tony" was identified as Antonio Johnson, and "Chante" was identified as Chante Hunt. Johnson and Hunt each testified at trial that, as they walked up Kilmer Street with Warren on July 10, Warren stopped to talk with a man in a green car after the man called out to him. The two men testified that they had heard shots as they proceeded up the street without Warren, and that Warren had later admitted to them, individually, that he had shot the man in the car. According to Johnson, Warren shot Simpson because Simpson had tried to give him fake money for the second time. Johnson and Hunt also testified that they had each seen Warren with a gun the day before the shooting, and Johnson identified that weapon as a .380 automatic.

Andre Wright and Stanley Williams were the first people to stop at the accident scene the night of July 10. Wright and Williams had been

driving in a gold or brown car. Wright testified that they had seen Simpson's car "running" on the porch of a house as they drove down Kilmer Street, and that Simpson had been hanging out the window waving his arm. Wright and Williams turned their car around after they had passed the house, parked, and approached the car. By this time, Wright testified that Simpson was no longer moving. Wright reached into the car and put it in park. When the engine continued to race, Wright approached the car again and turned off the engine. Like Warren, Wright and Williams were interviewed extensively by police officers the night of the shooting.

The police recovered three spent shell casings in and around Simpson's car. A ballistics expert determined that the shell casings were from .380 caliber bullets and that all three had been fired from the same gun. On the seat of the car, police also found a bundle of fake three-dollar bills wrapped in a couple of real dollar bills.

The defense presented two witnesses, Patricia and John Moreland, who lived in the neighborhood where the shooting occurred and knew Warren prior to the shooting. Patricia Moreland testified that she had heard two gunshots as she returned to her house from a friend's house around midnight on July 10. She testified that she had seen Warren on Randolph Street around the time the shots were fired and that she had seen the green car "speeding" on Kilmer, Lakeview and Adelite Streets. Mrs. Moreland further testified that she had heard the shots, but had not seen Simpson get shot, and that there was no one in the vicinity of Simpson's car when the

shots were fired.   Mrs. Moreland did not see anyone else on Kilmer Street. Mrs. Moreland stated that she ran into her house when the shots were fired and did not see or hear the car crash.

John Moreland stated that his wife had returned home around 11:00 or 11:30 on July 9, and that she was at home when they heard a loud crash outside.   He also testified that he had seen two men drive by the accident in a brown car, turn around, and park across the street from the house into which the car had crashed.   He testified that he had watched these men approach the green car several times and reach inside.   He said that the men had not appeared to be helping the driver, that it looked as if they had been searching for something, and that they had reached down by the driver's feet.

*Warren I,* 2d Dist. Montgomery No. 15202, 1996 WL 612858 at *1-2.

*Warren II*

**{¶ 4}** On November 19, 2013, 17 years after this court's decision in *Warren I*, Warren filed a pro se motion captioned "Motion for Hearing of Criminal Rule 33A-2 Newly Discovered Evidence."   In the motion, Warren requested a hearing on newly discovered evidence that Warren believed warranted a new trial.   Warren identified the newly discovered evidence as an affidavit executed by Chante Hunt in October 1999 recanting his trial testimony, as well as two affidavits executed by Antonio Johnson in August 2008 wherein he also recanted his trial testimony.   All three affidavits were attached to Warren's motion.   In the affidavits, Chante and Antonio averred that Warren did not kill

Simpson and that they had told the police otherwise out of fear of being charged with Simpson's murder. Both Chante and Antonio also averred that the police threatened to charge them with the murder if they did not testify against Warren.

**{¶ 5}** In ruling on Warren's motion, the trial court interpreted the motion as seeking leave to file a motion for new trial. On January 30, 2014, the trial court overruled the motion on grounds that more than 120 days had elapsed since Warren's trial concluded and because Warren had failed to prove by clear and convincing evidence that he was unavoidably prevented from discovering the recantation evidence on which the motion was based.

**{¶ 6}** Warren appealed from the trial court's decision, and on January 9, 2015, this court concluded that "the trial court erred when it overruled his motion for leave to file a motion for new trial before allowing Warren his allotted time to file a reply memorandum." *State v. Warren*, 2d Dist. Montgomery No. 26112, 2015-Ohio-36, ¶ 15 ("*Warren II*"). This court therefore reversed and remanded the matter back to the trial court for further proceedings.

*Warren III*

**{¶ 7}** Following the remand in *Warren II*, with the assistance of a public defender, Warren moved to amend and supplement his motion for leave to file a motion for new trial. The trial court granted said leave and Warren thereafter filed an "Amended and Supplemented Motion for Leave to File a Motion for New Trial" on May 20, 2015. In the amended and supplemented motion for leave, Warren again argued that Chante and

Antonio's recantations were newly discovered evidence that warranted a new trial. Warren also argued that a new trial was warranted based on new scientific evidence that undermined the AA test that was performed on his hands to check for the presence of gunshot residue. Warren argued that his incarceration, lack of resources, and the unavailability of the recanting witnesses prevented him from discovering the new evidence sooner and that he should be granted leave to file a motion for new trial beyond the 120-day deadline set forth in Crim.R. 33(B).

{¶ 8} In support of his amended and supplemented motion for leave, Warren attached several exhibits. The exhibits included the affidavits executed by Chante and Antonio that were attached to his previous motion. Warren also included an additional affidavit executed by Antonio on January 21, 2015. In that affidavit, Antonio averred that he did not tell the truth after Warren's trial because he feared that he would be charged with perjury. Warren also attached an F.B.I. "Forensic Science Communications" research article on gunshot residue ("GSR") that was published in July 2006.

{¶ 9} In addition to these attachments, Warren attached several affidavits from attorneys and investigators who had assisted him after his conviction. One of the attorneys, Robert Lane, was a public defender who averred that his office's intake attorney, John Fenlon, responded to Warren's initial request for assistance from the public defender's office in May 2003. Attached to Lane's affidavit was a May 30, 2003 letter from Fenlon advising Warren of the time limitations associated with filing a motion for new trial. In the letter, Fenlon notes that Chante's recantation affidavit is three years old and explains that "a court may find the delay in utilizing the affidavit grounds alone to dismiss a motion for new trial." Amended and Supplemented Motion for Leave to File a Motion

for New Trial - Exhibit L (May 20, 2015), Montgomery County Court of Common Pleas Case No. 1994 CR 3533, p. 5-6.

{¶ 10} On December 15, 2015, the trial court issued a decision overruling Warren's motion for leave to file a motion for new trial. The trial court found that Warren failed to demonstrate that he filed the motion within a reasonable time and that he did not adequately explain the reasons for his delay. The trial court further concluded that Warren "ha[d] known about all of the substantive evidence upon which he relie[d] since, at the latest, 2008, and at the earliest 1999." Decision, Order and Entry Overruling Motion for Leave to File Motion for New Trial (Dec. 15, 2015), p. 22-23. Therefore, the trial court found that Warren was not entitled to an evidentiary hearing on his motion for leave.

{¶ 11} Warren thereafter appealed from the trial court's decision denying his motion for leave, and on March 10, 2017, this court determined as follows:

> The record establishes that Warren did not begin receiving pieces of his newly discovered evidence which serve as the basis for his motion for leave until 1999. However, the evidence Warren received was *just one* recantation affidavit from only one of the State's witnesses. We note that in its decision denying Warren's motion for leave, the trial court misstated the record when it made the following finding: "Warren has known about *all* of the substantive evidence upon which he relies since, at the latest 2008, *and at the earliest 1999.*" The record belies the finding made by the trial court.

> Unquestionably, this is a complex and convoluted paper record.

There is a legitimate argument that Warren has followed the rules and marshalled the evidence he claims would warrant a hearing on his motion for leave to file a motion for a new trial, and that he has reasonably attempted to obtain the assistance of private and public attorneys in seeking to present that evidence to the court.

In light of the foregoing, we find that the documents attached to his motion for leave, on their face, support a conclusion that he was unavoidably prevented from discovering the evidence within the time provided by the statute. Therefore, we conclude that the trial court abused its discretion when it denied Warren's motion for leave to file a motion for new trial without first conducting a hearing in order to determine whether he was unavoidably prevented from timely discovering the new evidence, and, once the evidence was obtained, whether he filed his motion within a reasonable time.

(Emphasis sic.) *State v. Warren*, 2017-Ohio-853, 86 N.E.3d 728, ¶ 52-54 (2d Dist.) ("*Warren III*").

{¶ 12} Based on the foregoing, this court remanded the matter back to the trial court "for a hearing to determine whether Warren was unavoidably prevented from discovering the new evidence, and, once the evidence was obtained, whether he filed his motion within a reasonable time." *Id.* at ¶ 59.

*Motion for Public Records*

{¶ 13} On April 19, 2017, prior to the hearing ordered by this court in *Warren III*,

Warren filed a "Motion for an Order Finding that He is Entitled to Public Records Pursuant to O.R.C. § 149.43(B)(8)." In the motion, Warren sought the records pertaining to the gunshot residue testing that was conducted on him after the shooting, as well as police investigatory records related to the death of Simpson. Warren argued that those records were necessary to support a justiciable claim. He also argued that if his trial occurred today, the public records sought would be discoverable under the current version of Crim.R. 16. Warren further argued that denying him access to the public records infringed upon his due process and equal protection rights and inhibited his ability to present a meaningful defense.

{¶ 14} On September 13, 2017, the trial court overruled Warren's motion for public records. In overruling Warren's motion, the trial court explained that in order for Warren to be entitled to the requested records under R.C. 149.43(B)(8), he was required to demonstrate that he had a pending justiciable claim and that the records were material to the pending proceeding. The trial court, however, found that the "reports and records Warren [sought were] not new evidence and [were] not related to the issues pending before the court, that is, whether he was unavoidably prevented from timely discovering the new evidence, and, once the evidence was obtained, whether he filed his motion within a reasonable time." Decision, Order and Entry Overruling Motion for an Order Finding that Defendant is Entitled to Public Records (Sept. 13, 2017), p. 4-5. Therefore, the trial court concluded that the "records Warren [sought did] not relate to his discovery of new evidence, nor the timeliness of his motion." *Id.* Accordingly, the trial court held that Warren failed to establish that the requested records were material to any motion pending before the court.

{¶ 15} In reaching its decision, it was also significant to the trial court that "the documents Warren [sought were] records that existed before his trial and which his counsel would have been provided prior to his trial." *Id.* at 5. The trial court noted that the "pending version of Crim.R. 16 has been in place in Montgomery County, pursuant to Local Rule, since long before Warren's original trial, and there is a long history of full and open discovery, by Local Rule, in Montgomery County, many years before Rule 16 of the Ohio Rules of Criminal Procedure was amended in 2010." *Id.* The trial court further noted that, in 1993, "Montgomery County Loc.R. 3.03 was enacted, which provided that the prosecutor must furnish the defendant with all police reports and all witness statements, and far exceeded the mandates of Crim.R. 16 in effect at the time." *Id.*

*Evidentiary Hearing*

{¶ 16} After the trial court overruled Warren's motion for public records, the trial court held a three-day hearing on Warren's motion for leave to file a motion for new trial as ordered by this court in *Warren III*. At the start of the hearing, the trial court clarified that the purpose of the hearing was not to try a motion for new trial, but rather to try a motion for *leave* to file a motion for new trial, for which the burden of proof was on Warren. In an attempt to satisfy his burden, Warren testified on his own behalf and called ten witnesses. The witnesses included mechanical engineer and firearms consultant John Nixon, psychiatrist Dr. Scott Bresler, attorney Jay Carter, criminal investigator Marcia Dukes, attorney Jennifer Bergeron, attorney Carl Goraleski, attorney Carrie Wood, Ohio Public Defender employee Joseph Bodenhamer, attorney Kim Murphy, and attorney Kenneth Rexford. Each witness testified as follows.

### 1. John Nixon

**{¶ 17}** John Nixon testified that he is a mechanical engineer and firearms consultant who is board certified by the International Board of Forensic Engineering Sciences. Nixon testified that he was contacted by the Ohio Public Defenders' Office to review Warren's case regarding the AA testing performed on Warren's hands for GSR. In conducting his review, Nixon testified that he read the trial testimony of Gary Schaffer— the Miami Valley Regional Crime Laboratory chemist who was called by the State to testify on subject of GSR testing at Warren's 1994 trial.

**{¶ 18}** Nixon thereafter testified that AA testing was primarily used in the 1990s. Nixon opined that the only conclusion that can be drawn from AA testing is whether the elements of lead, barium, and antimony are present in the samples, not the source of those elements. Nixon also testified that:

> [T]here has been a lot of research in this particular area, and I concluded that there were lots of opportunities for the Defendant to become contaminated with substances which may show what would be indicative of gunshot residue which actually weren't. And that would have been from the Defendant was said to have been working on a motor scooter the same day. He was also transferred to a police station in a police car, and then interviewed in a police station before his hands were sampled. And all of those are potential sources of contamination.

Hearing Trans. p. 19.

**{¶ 19}** According to Nixon, "in the mid to late '90s there were questions asked and

it was realized that there were better ways to do the [GSR] analysis[.]"  *Id.* at p. 27-28.

Nixon explained that "the SEM/EDS technique was the way that was recommended, and the FBI first started using [SEM/EDS] in the mid to late '90s."  *Id.* at 28.  When asked if the AA technique was currently in use, Nixon responded, "I've only encountered one case recently where someone used an AA*** test kit, but they didn't have it analyzed."  *Id.* at 28.  Nixon testified that the "SEM/EDS technique is much better for identifying what you have there, and people are using that for probably ten years or more, but even that is being phased out because of the issues of contamination."  *Id.* at 29.  Nixon also testified that in 2006, the F.B.I. abandoned the SEM/EDS technique, noting that while "the information you get is a lot greater" the SEM/EDS test, "still doesn't tell you if those particles came from contamination or if they were from a gunshot at the scene of the incident."  *Id.* at 31.

{¶ 20} Nixon further provided the following information about AA and SEM/EDS testing during his cross-examination:

Q.    And you yourself testified earlier, sir, that police cars may be a haven for particulates and gunshot residue due to the nature of firearms being prevalent in a cruiser and things of that nature.  So what my question to you, in fairness, is again, neither test is going to help resolve the issue as to whether somebody actually fired a weapon, and that's why they're not used in court.

A.    Yes.  Yes, that's correct.

Q.    In fact, you have to - - you said yourself the FBI abandoned these tests and do not rely on them at all to determine whether somebody

fired a weapon; is that correct?

A. Yes the basic conclusion is you can detect whether it is likely or not to be GSR particles, but you don't know where they came from.

* * *

Q. Okay. And my other question is in your vast experience, you've travelled all over, have you testified in any court as an expert, to give testimony to a jury regarding whether you can determine to a scientific certainty, that somebody fired a weapon using the SEM test?

A. Not that I recall, no.

Q. Okay, and you can't even do that today, can you?

A. No.

* * *

Q. Okay. And again, we've talked about the transference issues and the cross-contamination issues, and the fact that these elements are readily available in the environment. Those are all factors that really lead * * * you - - in the scientific community, to not put a lot of weight into these tests?

A. Yes, that would be correct.

Hearing Trans. p. 51-57.

{¶ 21} Thereafter, on recross-examination, Nixon confirmed that in the course of AA testing, the samples are destroyed and that retesting is impossible. Nixon therefore agreed that "there are no new results, there are no new tests, there's no new

examinations as for this particular case, in this particular matter with Mr. Warren[.]" *Id.* at 67.

### 2. Dr. Scott Bresler

{¶ 22} Warren next called Dr. Scott Bresler to testify at the hearing. Bresler is the clinical director of forensic psychiatry at the University of Cincinnati's College of Medicine. Warren indicated that Bresler's testimony would establish the reason for his delay in obtaining executed recantation affidavits from Chante and Antonio. According to Warren, Bresler would testify that the delayed recantations were due to the course of adolescent brain development. The State, however, objected to Bresler's testimony on relevance grounds. The trial court sustained the State's objection upon finding that Bresler's testimony was irrelevant because it did not explain Warren's delay in filing his motion for leave to file a motion for new trial *after* he had obtained Chante and Antonio's recantation affidavits. Accordingly, Bresler was not permitted to testify at the hearing.

### 3. Attorney Jay Carter

{¶ 23} After sustaining the State's objection to Bresler's testimony, Warren called attorney Jay Carter to testify. Carter testified that he was hired by Warren's brothers in the late 1990s to investigate a possible recantation by a witness at Warren's trial. Carter also testified that he could not recall the name of the witness in question, and that he did not recall filing anything on Warren's behalf. Carter instead testified that he "kept getting promises about additional money and it didn't come, and I think I just stopped working on

it[.]"   Hearing Trans. p. 81.

### 4. Marcia Dukes

**{¶ 24}** Warren next called Marcia Dukes to testify.   Dukes testified that she is a "criminal investigator, litigation specialist with the Ohio Public Defender."   Hearing Trans. p. 87.   Dukes testified that she worked on Warren's case in 2003 and 2004, and that attorney Robert Lane asked her to locate and interview Chante and Antonio.   She testified that she could not locate Antonio, but that she located Chante in the Montgomery County Jail and interviewed him regarding his 1999 affidavit on March 18, 2004.   Dukes also identified an affidavit she executed on January 15, 2015, in which she averred: "During my interview with him, Chante Hunt affirmed his 1999 affidavit and stated that he lied during Raymond Warren's trial because he was scared of the police."   *Id.* at 94.

### 5. Attorney Jennifer Bergeron

**{¶ 25}** Warren also called attorney Jennifer Bergeron to testify.   Bergeron testified that for the past ten years she has been an attorney for the Ohio Innocence Project ("OIP") at the University of Cincinnati College of Law.   She testified that Warren "wrote into the Innocence Project back in 2008 and [she] directly supervised his case for some time starting in 2011 up until, * * * 2013."   Hearing Trans. p. 101.   Bergeron stated that Warren submitted Chante's and Antonio's affidavits to the OIP.   She testified that law students working on Warren's case made contact with Antonio and that the OIP obtained another affidavit from Antonio.

**{¶ 26}** Bergeron testified that by 2009, the OIP had a copy of Warren's trial

transcript, but in September 2009, the OIP decided to close his case. Bergeron testified that in 2011, the OIP decided to reopen Warren's case and sent Warren a letter informing him of the reopening on December 24, 2011. Bergeron stated that in 2012, she and some OIP students went to visit Warren at the Toledo Correctional Institution where she learned that Warren had allegedly stabbed another inmate. Bergeron testified that she was "concerned about moving forward if [Warren] was going to potentially face additional charges." *Id.* at 113. Bergeron testified that on August 31, 2012, she sent Warren a letter advising him that she was "not going to be able to move forward on his case." *Id.* at 115. Thereafter, Bergeron testified that she sent Warren release of information forms and referred him to attorney Kim Murphy.

**{¶ 27}** During the hearing, Bergeron identified a December 19, 2012 correspondence she sent to Warren advising him that Murphy had his trial transcript and was familiarizing herself with his case. Bergeron also identified a letter dated May 24, 2013, advising Warren that the OIP was officially closing his case and transferring it to Murphy. Bergeron testified that on February 6, 2014, she received a letter from Warren stating that he had been unable to make contact with Murphy and that he had filed a pro se motion as a result. In the letter, Warren requested Bergeron's assistance with the pro se motion. Specifically, Warren requested that Bergeron send him an affidavit explaining what the OIP had done on his case. Bergeron testified that she did not provide him with the affidavit because she had looked into the matter and discovered that his pro se motion had already been denied.

**{¶ 28}** In response to questions from the trial court, Bergeron testified that the OIP is not appointed by the court and that Warren was not prevented from filing any pro se

motions with the trial court while he was represented by the OIP. However Bergeron explained that if the OIP is working on a case, "the individuals that [they] are working on the case for are probably not going to go out and file on their own because their hope is that eventually [the OIP] can assist them[.]" Hearing Trans. p. 138.

### 6. Attorney Carl Goraleski

**{¶ 29}** Following Bergeron's testimony, Warren called attorney Carl Goraleski to testify. Goraleski testified that he and Glen Dewar from the Montgomery County Public Defender's Office were appointed to represent Warren in 1994. Goraleski testified that Gary Schaffer of the Miami Valley Regional Crime Lab testified for the State about GSR testing at Warren's trial. Goraleski testified that he researched GSR testing prior to trial in order to prepare for Schaffer's cross-examination. Goraleski testified that from his research, he learned that antimony and barium are two elements that are tied to GSR testing and that both elements can be found in other combustible materials such as matches and automotive parts.

**{¶ 30}** Goraleski also testified that Schaffer conceded at trial that antimony and barium can come from sources other than the "the primer of a bullet." Hearing Tran. Vol. I (Oct. 18, 2017), p. 143. Goraleski agreed that he had ample opportunity to cross-examine Schaffer about the other possible sources of antimony and barium. Goraleski also admitted that Schaffer did not conclusively testify that Warren had fired a gun.

**{¶ 31}** Goraleski further testified that at the time of trial, he and Dewar felt that Chante's and Antonio's statements to police "were suspect for their voluntariness and genuineness," and that "both [Chante and Antonio] were afraid." *Id.* at 148, 150. On

cross-examination, Goraleski testified that his concern "was heightened by the fact that these were juveniles as opposed to adults." *Id.* at 150-151. Goraleski also stated that he had ample opportunity to cross-examine Chante and Antonio at trial.

### 7. Attorney Carrie Wood

**{¶ 32}** Attorney Carrie Wood also testified for Warren. Wood testified that she worked for the OIP from early 2010 through August 2013. She stated that in December 2010, she discovered that Warren's OIP file had been misfiled. She stated that she found Chante's and Antonio's affidavits in the file. Wood described the "close letter" sent to Warren as a "form letter" that "had nothing particular to Mr. Warren's case in it." Hearing Tran. Vol. I (Oct. 18, 2017), p. 162. Wood stated that based upon Chante's and Antonio's affidavits and the gunshot residue testimony, she decided "that the case was going to remain open[.]" *Id.* at 165.

**{¶ 33}** Continuing, Wood testified that she decided to assign Warren's file to new OIP students. Wood testified that OIP students are trained over the course of a summer and "continue that fellowship into both the fall and the spring semester." *Id.* at 191. She testified that OIP cases typically transition through a number of attorneys and students in the life of the case. In response to a question from the trial court, Wood acknowledged that a total of eight law students and four attorneys reviewed Warren's file.

**{¶ 34}** Wood also testified that attorney Kim Murphy had contacted the OIP and expressed an interest in volunteering. Wood testified that Murphy initially worked on a separate case involving DNA, but "dropped off the face of the Earth" after the DNA case became more difficult. *Id.* at 168. Wood testified that she informed Bergeron of the

situation with Murphy.

### 8. Joseph Bodenhamer

**{¶ 35}** Warren next called Joseph Bodenhamer to testify. Bodenhamer testified that he is the director of the Wrongful Conviction Project at the Ohio Public Defender's Office. Bodenhamer testified that the Wrongful Conviction Project is "a small unit in the [public defender's] office that primarily reviews innocence claims from people incarcerated in Ohio who have exhausted their appeals." Hearing Tran. Vol. I (Oct. 18, 2017), p. 199-200. Bodenhammer stated that the Wrongful Conviction Project received an application from Warren in March 2013. Bodenhamer testified that after performing an initial screening, he learned that Bergeron from the OIP was reviewing Warren's case. As a result of that information, Bodenhammer testified that he closed Warren's case and sent Warren a letter dated April 9, 2013, advising him of the closure.

### 9. Attorney Kim Murphy

**{¶ 36}** Warren also called attorney Kim Murphy to testify. Murphy testified that she agreed to voluntarily represent Warren in 2013, "[p]rovided [her] requirements were met." Hearing Trans. p. 221. Murphy testified that one of those requirements was that Richard Ketchum, her "ex-husband, who was a very well-known defense attorney, would have to be [her] co-counsel, because [she's] a divorce lawyer." *Id.* She stated that she and Ketchum, along with a number of law students, met with Warren in Lucasville in April 2013. Thereafter, Ketchum was "diagnosed with an illness and was not able to drive or write." *Id.* at 222. Murphy testified that she obtained the file of a postconviction

proceeding that Ketchum conducted several years earlier in Franklin County and read it "in the interest of finding out if there was anything legally that [she] could accomplish, without [Ketchum] being bothered." *Id.* at 223. However, after reviewing the file, Murphey realized that she would not be able to accomplish anything without Ketchum's assistance. Murphy testified that she "was completely out of [her] depth at that point." *Id.*

{¶ 37} When asked if she was ever involved in filing a motion for a new trial for Warren, Murphy replied, "[w]hen we met with Mr. Warren, [Ketchum] at that time, felt strongly that his best option was the parole hearing." *Id.* Murphy testified that Ketchum "got sicker and [she] didn't do what [she] was supposed to do." *Id.* at 224. When asked if she took steps to pursue a motion for leave to file a motion for a new trial, Murphy responded, "I don't even know what that is." *Id.* Murphy testified that she did not have further direct contact with Warren after meeting with him in Lucasville. She testified that she advised him via correspondence that his case was closed in February 13, 2014. Murphy testified that Ketchum passed away at the end of 2015, and that she "had no ability to represent Mr. Warren without [Ketchum.]" *Id.* at 227.

{¶ 38} On cross-examination, Murphy testified that her and Ketchum's involvement with Warren's case was pro bono. She stated that she reviewed Chante's and Antonio's affidavits when she reviewed Warren's file. Murphy testified that Ketchum was diagnosed two weeks before they went to Lucasville, and at that time, her chief focus was on Ketchum. Regarding the decision to close Warren's file, Murphy testified that she "didn't decide." *Id.* at 236. Rather, Murphy claimed that someone from the OIP contacted her and told her that she needed to take formal steps to get off of the case so

the OIP could get Warren representation. Murphy testified that it was at that point in time she felt "this was really irresponsible" because Warren "thought he had a lawyer." *Id.* at 236-237. Murphy testified that Warren wrote to her at least twice a month for several months, and that she did not respond. In response to questions from the trial court, Murphy testified that she never signed a written representation letter with Warren and never represented herself as having criminal experience.

**{¶ 39}** On redirect examination, Murphy testified that between May 24, 2013, and February 13, 2014, she did not communicate to Warren that she would not represent him. When asked if she ever communicated to Warren that Ketchum's health problems prohibited his effective representation, Murphy responded: "If I haven't made it clear that I didn't communicate anything to Mr. Warren, let me say, I did not communicate anything to Mr. Warren." Hearing Trans. p. 247.

### 10. Attorney Kenneth Rexford

**{¶ 40}** Warren also called attorney Kenneth Rexford to testify. Rexford testified to being a private practice attorney in Lima, Ohio, since 1995. Rexford testified that he was engaged to represent Warren by Warren's friends and family and that he was paid to do so over the course of several months. Rexford recalled "that there were two young individuals * * * [who] tried to blame [Warren for Simpson's murder] and I remember not feeling that seemed strong." Hearing Trans. p. 255.

**{¶ 41}** Rexford testified that since Warren's judgment entry of conviction did not include the manner of conviction "our goal with Mr. Warren was to reopen the case by accomplishing a new final appealable order." *Id.* at 258-259. Rexford testified that his

focus was on postconviction relief as the means for presenting Chante's and Antonio's recantations. Rexford testified that a postconviction proceeding was "very important to us, because it would thereby enable us to bring in affidavits, witnesses, exhibits, things that would have not been part of the record and hence couldn't be brought up on appeal." *Id.* at 259.

{¶ 42} During the hearing, Rexford identified several correspondences that he sent to Warren between May 2009 and June 2010. Rexford's correspondences and testimony reflect that on October 28, 2009, he filed a motion for resentencing based on Warren's judgment entry not including the manner of conviction. Rexford, however, testified that the motion resulted in the trial court issuing a nunc pro tunc entry to correct the original judgment entry of conviction, which was not the intended result.

{¶ 43} Rexford testified that after the nunc pro tunc entry was issued, he pursued mandamus relief in the Supreme Court of Ohio, but the action was dismissed. Rexford also sent a February 26, 2010 correspondence to the parole board, which provided in part:

[I]t is also my opinion that the conviction was against the manifest weight of the evidence. In other words, I believe that this conviction was errant. Simply put, the prosecution relied on little to no physical evidence but rather the testimony of two scared kids who changed their stories.

Defense Exhibit N-7.

{¶ 44} On cross-examination, Rexford testified that his representation of Warren was terminated for nonpayment of fees. Rexford testified that in a correspondence dated June 2, 2010, he advised Warren that he could hire new counsel or act pro se. Rexford

testified that he did not file a motion for leave to file a motion for a new trial because he believed he was "out of time." Hearing Trans. p. 306. Rexford testified that "at that time, nobody would [go with] a motion for new trial if you could go with the reopen the case argument." *Id.* at 308. He stated that as a tactical decision, he rejected the new trial option. Rexford testified that "if I would have gotten a case in 2009, with a 2002 filing of a 1999 affidavit, then * * * I would have thought we would have no chance * * * of [getting a] new trial on that basis alone." *Id.* at 317. Rexford testified that, at the time, postconviction relief "had proved successful in a number of cases." *Id.* at 324.

### 11. Raymond Warren

**{¶ 45}** Finally, Warren himself testified at the hearing. During his testimony, Warren identified several pro se filings that he submitted to the trial court following his conviction. Warren identified a September 16, 1997 pro se "Motion for Production of Transcripts by Indigent Defendant," which he asserted the trial court did not rule on. Warren also identified a January 9, 2002 pro se "Motion to Receive Copy of Trial Transcripts," wherein Warren stated his intention to move for a new trial based on newly-discovered evidence. Specifically, Warren testified that he requested the trial transcripts so he "could begin to utilize one of the affidavits that a[n] attorney had obtained to try to start some type of legal process to prove [his] innocence." Hearing Trans. p. 393. Although Warren indicated that the trial court overruled his motion for transcripts, Warren testified that his mother later obtained the transcripts for him.

**{¶ 46}** Warren also identified a January 13, 2005 pro se "Motion Requesting Court Records Pursuant to R.C. 149.43(B)(4)," which the trial court also overruled. Warren

further identified a January 31, 2005 pro se "Motion to Reconsider Defendant's Motion Requesting Court Records," for which the trial court did not issue a ruling. Warren also testified that in 2005, he filed a pro se petition for habeas corpus in state court, which was denied. Warren stated that after proceeding pro se as set forth above, he concluded that he would "not be successful on [his] own, [and] * * * needed legal representation[.]" *Id.* at 398.

**{¶ 47}** Continuing, Warren testified that attorney Jay Carter obtained Chante's affidavit and mailed it to him sometime in 1999. Warren stated that after he received the affidavit, Carter ceased work on his case, and that he did not know what his legal options were with respect to the affidavit. Warren testified that he wrote to "actually hundreds of attorneys" and "asked them for help[,]" but "[a]t that time, there wasn't a lot of Innocence Projects." *Id.* at 401. Warren thereafter identified a letter he sent to the Ohio Public Defender's Office on March 11, 2003. Warren testified that he corresponded with attorney Robert Lane from that office and that Lane was "giving [him] advice and looking into the matter." *Id.* at 404. Warren testified that he sent Lane a copy of Chante's affidavit and that Lane's correspondence "seemed very helpful," and that he "felt pretty good" at the time. *Id.*

**{¶ 48}** Warren, however, testified that Lane subsequently advised him that "he was unable to move forward." Hearing Trans. p. 405. Warren identified a letter from Lane dated May 12, 2004, stating that Lane could no longer assist him and that if he "wish[ed] to file a motion for new trial, or any other legal action, [he would] have to do so on [his] own behalf, or obtain other counsel." Joint Exhibit I. The letter from Lane also stated that:

Your primary issue centered on Chante Hunt's 1999 "recantation." * * * One of our investigators talked to Hunt, and while Hunt maintains that the statements which he made in his 1999 affidavit are true, it is my opinion that no court would find his recantation to be believable. In order for a judge to find Hunt credible, the judge would have to disbelieve both Hunt's and [Antonio] Johnson's trial testimony, and would have to believe that the police forced both of them to commit perjury. * * * Furthermore, Hunt waited four years to come forward. Then, another three-and-one-half years elapsed before you sent the affidavit to us. That passage of time diminishes the credibility of Hunt's recantation.

If [Antonio] Johnson were to come forward and testify that he was forced to commit perjury against you, that might change your chances of success. * * * But even if he were to say that you were not involved in the shooting, and that he was forced to lie at your trial, we would still have the problem of it taking so long for him to some forward with that new information.

Joint Exhibit I.

{¶ 49} Warren testified that he did not file a pro se motion for a new trial at that time because he did not have an affidavit from Antonio recanting his trial testimony. Warren testified that his mother and other family members tried to find Antonio, but that he could not be located. Warren testified that in 2008, while at the Warren Correctional Institution, a fellow inmate overheard Warren mention Antonio's name and told Warren that he knew Antonio. Warren testified that the inmate later went home and obtained

Antonio's contact information, which Warren relayed to the OIP.

**{¶ 50}** During the hearing, Warren identified an August 13, 2008 affidavit executed by Antonio that Warren received from his mother. Defense Exhibit B. Warren also identified an August 18, 2008 affidavit executed by Antonio that was obtained by the OIP. Defense Exhibit C. Warren stated that he received both affidavits "within a couple weeks of them being done." Hearing Trans. p. 412. Warren testified that he did not file a motion for a new trial at that point because he was being represented by the OIP. However, Warren testified that he later received a September 23, 2009 correspondence from the OIP advising him that his file was being closed "due to a lack of sufficient new evidence." Defense Exhibit L-4.

**{¶ 51}** After the OIP closed his file, Warren testified that he hired Rexford to represent him. Warren stated that he did not file a pro se motion for a new trial at that time because he was being represented by Rexford. Warren testified that a friend provided him with the funds to pay for Rexford's legal services.

**{¶ 52}** Warren thereafter identified a June 2, 2009 correspondence from Rexford advising him that his 1995 judgment entry of conviction "does not appear to be a 'final appealable order,' " because the "judge never include[d] the verdict." Defense Exhibit N-2. In the correspondence, Rexford indicated that "this may be the Holy Grail we are looking for." *Id.* Rexford also advised Warren that "we should be able to get the Trial Court to issue a new Judgment Entry of Sentencing to correct the old, errant one." *Id.* The letter went on to state that: "You think you were sentenced, but you were not, as a matter of law." *Id.* In the letter, Rexford indicated that when "the new final appealable order issues, we will now be in a situation as if it was April 5, 1995, all over again." *Id.*

Rexford also noted that Warren's "time limitation of filing a Petition for Post-Conviction Relief starts to run when your case is finished." *Id.*

{¶ 53} Warren testified that he believed Rexford was "pursuing options to get [his] appeals time started over by addressing [his] judgment entry of sentencing," and that "this was the avenue in which to start proving [his] innocence." Hearing Trans. p. 423-424. When asked why he did not pay Rexford to file a motion for a new trial as well, Warren responded that he could not afford it, and that "this was a cheaper, quicker route to obtain the results." *Id.* at 425-426.

{¶ 54} Warren, however, testified that the expected outcome was not reached as the trial court corrected his sentencing entry nunc pro tunc. He testified that Rexford thereafter filed a mandamus action on his behalf, which was dismissed on May 26, 2010. Warren testified that he did not have any money to continue to pay Rexford at that time. When asked why he did not then file a pro se motion for a new trial, Warren responded, "[b]ecause I started interacting with the Ohio Innocence Project once again." *Id.* at 428.

{¶ 55} Warren testified to receiving a correspondence dated January 24, 2011, from the OIP indicating that the organization was going to reopen his case. However, Warren testified that after the OIP learned about an altercation he had with gang members at the Toledo Correctional Institution, he received an August 31, 2012 correspondence from Bergeron advising him that the altercation "hindered [OIP's] further involvement." *Id.* at 434. In the letter, Bergeron suggested that the OIP talk to attorney Kim Murphy on Warren's behalf, and indicated that Murphy had "a criminal law background and ha[d] previously expressed a desire to work on OIP cases." Defense Exhibit L-6. Warren stated that he thereafter signed a release to give Murphy access to his case.

{¶ 56} Warren testified that after he met with Murphy, Ketchum, and law students, he believed that "Murphy was going to be studying and investigating the case file and then preparing a motion for either new trial or something along those lines to prove [his] innocence." Hearing Trans. p. 438-439. Warren testified that he wrote to Murphy "once every other week and then later every week," without response. *Id.* at 440. He stated that he felt at "a loss and distraught" and that no one informed him that Ketchum was ill. *Id.* at 441.

{¶ 57} Warren testified that after giving Murphy some time, he wrote to the "Wisconsin Innocence Project, two Innocence projects in the news, several Innocence Projects in New York, several Innocence Projects in Michigan, [current counsel's] office, the Ohio Innocence Project again, mostly every Innocence protect in the Midwest and the East Coast[.]" *Id.* at 442. When asked why he did so rather than filing something pro se, Warren responded "[b]ecause they were trained professionals." *Id.* at 443. Warren stated that he was repeatedly referred to the Ohio Innocence Project and that he wrote to "[a]nywhere from 700 to 1200" attorneys seeking assistance. *Id.* at 454.

{¶ 58} Continuing, Warren testified that when he initially wrote to his current counsel's office, her office did not accept the case because he was being represented by Murphy. Warren also testified that he could not get any innocence projects to review his case because of Murphy's representation. As a result, Warren testified that he decided to file his November 19, 2013 pro se "Motion for Hearing of Criminal Rule 33A-2 Newly Discovered Evidence." Warren testified that "[i]t was the last-ditch effort to try to begin the process." *Id.* Warren acknowledged that he did not cite any case law in the motion or discuss the GSR evidence because he "didn't know that was relevant to [his] situation."

*Id.* at 452. Warren also testified that he did not specifically file a motion for leave to file a motion for new trial because he "didn't know that was something you had to do." *Id.*

**{¶ 59}** During cross-examination, Warren denied previously knowing about the time limitations for filing a motion for new trial. Warren also generally acknowledged that Rexford advised him of his ability to file pro se. Specifically, Warren testified that Rexford advised him via letter dated July 28, 2009, that: "You also have the option, of course, of filing the motion to re-sentence yourself and then involving me when it is granted, for appeal, or if it is denied, on mandamus." Defense Exhibit N-4. Warren also testified that in a correspondence dated June 12, 2010, Rexford advised him that: "If you are growing uncomfortable with this relationship, you are free, obviously, to hire new counsel for this purpose or to do this pro se." Defense Exhibit N-8. In addition, Warren acknowledged that the affidavit attached to his January 9, 2002 pro se motion for trial transcripts averred that he was "presently preparing a motion for a new trial," and that he attached Chante's 1999 affidavit to that motion. Defense Exhibit R-2.

*Trial Court's Decision on Motion for Leave*

**{¶ 60}** On July 19, 2018, after considering the testimony and evidence presented at the evidentiary hearing, as well as the arguments raised in the parties' pleadings and post-hearing memoranda, the trial court issued an order overruling Warren's motion for leave to file a motion for new trial. In overruling the motion, the trial court concluded that Warren failed to establish by clear and convincing evidence that he was unavoidably prevented from obtaining the evidence on which his motion for leave was based within the time required by law. In so holding, the trial court found that "Warren had knowledge of the existence of the grounds that support[ed] his motion for a new trial *at the time of*

*his trial in 1994.*" (Emphasis sic.)   Decision, Order and Entry Overruling Motion for Leave to File Motion for New Trial (July 19, 2018), p. 37.

**{¶ 61}** With regard to the recantation evidence, the trial court found that "Warren was well aware of the existence of the grounds supporting the motion for a new trial during his trial" since "Warren testified that he immediately knew [Chante and Antonio] were lying during his trial in 1994." *Id.* at 38.   The trial court found that "[t]he fact that [Warren] did not obtain affidavits from [Chante and Antonio] does not equal a finding that he was unavoidably prevented from doing so." *Id.* at 38.   The trial court further found that "[w]hile Warren attempted to introduce at the oral hearing testimony to suggest that [Chante and Antonio], because of their age, were reluctant to be honest or challenge the authority of police investigators, that evidence would not support a finding that Warren was unavoidably prevented from obtaining the evidence that he readily admits he knew even during his trial." *Id.*

**{¶ 62}** With regard to John Nixon's hearing testimony concerning the unreliability of AA testing, the trial court concluded that the testimony was not new evidence that Warren was unavoidably prevented from discovering.   The trial court found that it was clear from the trial transcript that Warren's defense counsel was aware of concerns associated with AA testing in 1994 and that defense counsel had the opportunity to cross-examine the State's forensic expert based on those concerns.   Accordingly, the trial court found "the criticisms of the testing utilized in Warren's case were evident and presented during Warren's trial, and were certainly known by the mid-2000s long before Warren filed his motion for leave." *Id.*   The trial court also found that Nixon's hearing testimony merely supported the evidence that Warren presented at trial in order to challenge the

GSR evidence. The trial court further found that Nixon's testimony about AA testing did not warrant a new trial given that no witness at Warren's trial ever testified that the AA testing results confirmed that Warren had shot a firearm.

{¶ 63} In addition to finding that the evidence at issue was not new and that Warren was not unavoidably prevented from obtaining the evidence, the trial court also found that the delay in filing his motion for leave to file a motion for new trial was unreasonable. The trial court noted that Warren waited 14 years after he obtained Chante's affidavit to file his motion for leave and five years after he obtained Antonio's first two affidavits. The trial court also noted that the pro se motion for transcripts filed by Warren in 2002 indicated that Warren was aware of the opportunity to move for a new trial well before he filed his motion for leave. The trial court also found that by 2003, Warren was aware of the time limitations associated with filing a motion for new trial. The trial court based this finding on the May 30, 2003 letter from public defender John Fenlon, wherein Fenlon specifically advised Warren that the three-year delay in utilizing Chante's affidavit would be grounds for the trial court to dismiss a motion for new trial. Therefore, the trial court determined that, although Warren was aware of the time limitations associated with filing a motion for new trial when he received Antonio's affidavits in 2008, Warren still waited five years to present those affidavits to the court in his initial motion for leave.

{¶ 64} In response to Warren's claim that the five-year delay was the result of relying on several attorneys who represented him, the trial court found that many of Warren's attorneys advised him that he could pursue motions, including a motion for new trial, on his own. The trial court further found that Warren's belief that he needed counsel to adequately present his motion for leave to file a motion for new trial was not the

standard upon which the timeliness of a motion is reviewed. The trial court also noted that Warren had no difficulty filing other pro se motions on his own, as he filed multiple pro se motions between 1997 and 2005. The trial court therefore determined that Warren had not adequately explained the reason for the undue delay in filing his motion for leave to file a motion for new trial and overruled the motion.

{¶ 65} Warren now appeals from the trial court's decision overruling his motion for leave to file a motion for new trial, raising three assignments of error for review.

**First Assignment of Error**

{¶ 66} Warren's First Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT OVERRULED WARREN'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

{¶ 67} Under his First Assignment of Error, Warren contends that the trial court's decision finding that he did not establish that he was unavoidably prevented from discovering the new evidence at issue was an abuse of discretion. Warren also contends that the trial court abused its discretion in finding that there was an unreasonable delay between the time he discovered the new evidence and filed his motion for leave to file a motion for new trial. We disagree with Warren's second claim, which is dispositive of his First Assignment of Error.

{¶ 68} As previously noted, Warren sought leave to file a motion for new trial based on newly discovered evidence, i.e., Chante's and Antonio's recantations and the changes in the acceptance of AA testing for GSR. "Crim.R. 33(A)(6) permits a convicted defendant to file a motion for a new trial upon grounds that new evidence material to the

defense has been discovered that the defendant could not with reasonable diligence have discovered and produced at trial." *State v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, ¶ 15 (2d Dist.). There is, however, a specific time limit in which a motion for new trial based on newly discovered evidence must be filed. Pursuant to Crim.R. 33(B): "Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived."

{¶ 69} "In order to file a motion for new trial beyond the 120-day time limitation specified in Crim.R. 33(B), a defendant must first seek leave of the trial court to file a delayed motion." (Citations omitted.) *State v. Moore*, 2d Dist. Clark No. 2017-CA-49, 2018-Ohio-318, ¶ 16. "To obtain leave to file a delayed motion for new trial, the defendant 'must demonstrate by clear and convincing evidence that he or she was unavoidably prevented from timely filing the motion for a new trial or discovering the new evidence within the time period provided by Crim.R. 33(B).' " *Id.* at ¶ 17, citing *State v. Warwick*, 2d Dist. Champaign No. 01CA33, 2002 WL 1585663, *2 (July 19, 2002).

{¶ 70} "Clear and convincing evidence" is " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of fac[t] a firm belief or conviction as to the facts sought to be established.' " *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. (Other citation omitted.)

{¶ 71} " '[A] party is unavoidably prevented from filing a motion for new trial if the

party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.' " *Parker,* 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, at ¶ 16, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984).

**{¶ 72}** With regard to when a motion for leave to file a motion for new trial must be filed, in *State v. Thomas*, 2017-Ohio-4403, 93 N.E.3d 227 (1st Dist.), the First District Court of Appeals explained that:

> Crim.R. 33(B) does not prescribe the time within which a motion for leave must be filed after the movant has learned of the proposed ground for a new trial. But the Second, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Appellate Districts **require the filing of a Crim.R. 33(B) motion within a reasonable time after the evidence supporting that ground was discovered.** See *State v. Seal*, 2017-Ohio-116, 75 N.E.3d 1035, ¶ 12-14 [(4th Dist.)]; *State v. Brown*, 186 Ohio App.3d 309, 2010-Ohio-405, 927 N.E.2d 1133, ¶ 24 (7th Dist.); *State v. Cleveland*, 9th Dist. Lorain No. 08CA009406, 2009-Ohio-397, ¶ 49; *State v. Willis*, 6th Dist. Lucas No. L-06-1244, 2007-Ohio-3959, ¶ 20-23; *State v. Berry*, 10th Dist. Franklin No. 06AP-803, 2007-Ohio-2244, ¶ 27-29; *State v. Valentine*, 11th Dist. Portage No. 2002-P-0052, 2003-Ohio-2838, ¶ 9; *State v. York*, 2d Dist. Greene No. 2000CA 70, 2001 WL 332019, *3-4 (Apr. 6, 2001); *State v. Barnes*, 12th Dist. Clermont No. CA99-06-057, 1999 WL 1271665, *3 (Dec. 30, 1999); *State v. Stansberry*, 8th Dist. Cuyahoga No. 71004, 1997 WL

626063, *3 (Oct. 9, 1997). Those courts found that a reasonable-time requirement is permitted as not inconsistent with the criminal rules, *see* Crim.R. 57(B), and advances the state objectives of those rules in securing the speedy and sure administration of justice and in eliminating unjustifiable delay, *see* Crim.R. 1(B), by discouraging a defendant from waiting to move for leave while the evidence against him dissipates or disappears. *See Seal* at ¶ 12; *Barnes* at *3, *Stansberry* at *3. No appellate district has refused to impose a reasonable-time requirement.

Here, we join our sister appellate districts in holding that ***even if the defendant has demonstrated that he could not have learned of the proposed ground for a new trial within the prescribed period, a court has the discretion to deny leave to move for a new trial, when the defendant has delayed moving for leave after discovering the evidence supporting that ground, and that delay was neither adequately explained nor reasonable under the circumstances.*** *See Seal* at ¶ 12; *York* at *3-4; *Stansberry* at *3.

(Emphasis added.) *Thomas* at ¶ 8-9.

**{¶ 73}** The trial court's denial of leave to file a motion for a new trial is reviewed for an abuse of discretion. *State v. Lanier*, 2d Dist. Clark No. 2009 CA 84, 2010-Ohio-2921, ¶ 18. *Accord State v. Risden*, 2d Dist. Montgomery No. 25234, 2013-Ohio-1823, ¶ 11. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery Nos. 24461, 24496, 24501, 2012-Ohio-1660, ¶ 29. "It is to be expected that most instances of abuse

of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 74} In this case, Warren was convicted of murder in 1995 and obtained Chante's recantation affidavit in 1999. Nine years later in 2008, Warren then obtained two recantation affidavits from Antonio. Warren testified that he immediately knew Chante and Antonio were untruthful at his trial and he argues that he could not obtain evidence of their untruthfulness until Chante and Antonio decided to recant their testimony. Although the trial court concluded that simply because Warren had knowledge of Chante and Antonio's untruthfulness since the time of his trial, he was not unavoidably prevented from obtaining evidence of the recantations within the time permitted by law, we need not address whether that finding constitutes an abuse of discretion. We instead focus on the unusual delay *after* Warren received the affidavits and find that delay was sufficient to support the trial court's denial of leave to file a motion for a new trial.

{¶ 75} We cannot find that the trial court abused its discretion when it found that Warren did not file his motion for leave within a reasonable time *after* discovering the recantation evidence. Although Warren had recantation affidavits from both Chante and Antonio by 2008, Warren did not request a Crim.R. 33 hearing on that evidence until five years later on November 19, 2013. Between 1997 and 2005, Warren filed several pro se motions, including a 2002 motion for transcripts wherein Warren indicated that he was

in the process of preparing a motion for a new trial based on newly discovered evidence. *See* "Motion to Receive Copy of Trial Transcripts" (Jan. 9, 2002), p. 1. Therefore, the record indicates that by 2002, Warren was aware of the mechanism for obtaining a new trial and was capable of proceeding pro se.

{¶ 76} As noted by the trial court, the record also indicates that Warren was aware of the time limitations associated with filing a motion for new trial as early as 2003. Warren was specifically advised of the time limitations in the May 30, 2003 letter from public defender John Fenlon and was specifically told that the three-year delay in utilizing Chante's 1999 affidavit would be grounds to dismiss a motion for new trial. Therefore, by 2003, Warren was made aware of the fact that a motion for new trial could be compromised by delaying the use of a supporting affidavit. Despite this information, Warren waited five years after he obtained Antonio's two recantation affidavits in 2008 before requesting leave to file a motion for new trial.

{¶ 77} Warren's excuse for the delay is that he diligently sought and relied on the assistance of several attorneys and that he preferred the assistance of attorneys as opposed to proceeding pro se. However, that excuse does not change the fact that he sat on the recantation evidence for five years before requesting leave to file a motion for new trial. Given the length of the delay and Warren's demonstrated ability to proceed pro se in this matter, it was not unreasonable for the trial court to find that Warren failed to offer a reasonable explanation for the delay in filing his motion. Therefore, the trial court did not abuse its discretion in denying Warren leave to file a motion for new trial based on undue delay.

{¶ 78} The trial court also did not abuse its discretion in finding that the evidence

presented on the unreliability of AA testing (which detects the presence of antimony and barium on a suspect's hands) was not newly discovered evidence that warranted a new trial. As noted by the trial court, the record indicates that Warren's defense counsel, Goraleski, was aware of the concerns associated with AA testing during Warren's 1994 trial, and that Goraleski cross-examined the State's forensic expert, Schaffer, accordingly. At the evidentiary hearing, Goraleski testified that he researched GSR testing prior to trial in order to prepare for Schaffer's cross-examination. Goraleski testified that from his research, he learned that antimony and barium are two elements that are tied to GSR testing and that both elements can be found in other combustible materials such as matches and automotive parts. Goraleski also testified that Schaffer conceded that antimony and barium can come from sources besides the primer of a bullet.

{¶ 79} The trial court further noted that Schaffer testified that antimony and barium are "naturally occurring in the environment," and that "certain individuals, through their work or whatever, can accumulate quantities of antimony and barium on their hands." Decision Order and Entry Overruling Motion for Leave to File Motion for New Trial (July 19, 2018), p. 5, citing Trial Trans., p. 120, 122-123. In addition, Schaffer testified that the elements are transferable from one location to another, and that "a variety of substances, including grease and lubricating oils contain barium[.]" *Id.*, citing Trial Trans., p. 123-125, 126. Most significantly, the trial court noted that Schaffer testified that he "[couldn't] say with any scientific certainty" how Warren came into contact with antimony and barium, and that he "[couldn't] say with any scientific certainty" that Warren fired a weapon. *Id.*, citing Trial Trans., p. 123-125. From this testimony, it is clear the limitations of AA testing for GSR were known at the time of Warren's trial.

{¶ 80} Although Warren's expert, Nixon, testified that SEM/EDS testing replaced AA testing for gunshot residue in the mid to late 1990s, Nixon acknowledged that "neither test is going to help resolve the issue as to whether somebody actually fired a weapon, and that's why they're not used in court." Hearing Trans. p. 51. Nixon further agreed that "there are no new results, there are no new tests, there's no new examinations as for this particular case, in this particular matter with Mr. Warren[.]" *Id.* at 67. As noted by the trial court, "the criticisms of the testing utilized in Warren's case were evident and presented during Warren's trial, and were certainly known by the mid-2000's, long before Warren filed his motion for leave." Decision, Order and Entry Overruling Motion for Leave to File Motion for New Trial at p. 37. We therefore find no abuse of discretion in the trial court's decision finding that Nixon's testimony regarding AA testing did not warrant an new trial, as it was not new evidence that Warren was unavoidably prevented from discovering.

{¶ 81} For the foregoing reasons, we do not find that the trial court abused its discretion in overruling Warren's motion for leave to file a motion for new trial. Accordingly, Warren's First Assignment of Error is overruled.

### Second Assignment of Error

{¶ 82} Warren's Second Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT EXCLUDED THE TESTIMONY OF DR. SCOTT BRESLER ON RELEVANCE GROUNDS. EVID.R. 402; EVID.R. 403(A); CRIM.R. 33(B); *STATE V. GREEN*, 2D DIST. GREENE NO. 2007 CA 2, 2009-OHIO-5529, HRG.TR.

69-76; DEF. HRG. EXS. E and F.

**{¶ 83}** Under his Second Assignment of Error, Warren asserts that the trial court erred in excluding relevant testimony from Dr. Bresler at the evidentiary hearing on his motion for leave to file a motion for new trial. According to Warren, Bresler was going to testify to the psychological pressures that lead to delayed recantations in adolescent witnesses. Warren argues that Bresler's testimony would have helped Warren to satisfy his burden to show that he was unavoidably prevented from discovering the recantation evidence. We find no merit to Warren's claim.

**{¶ 84}** "Because 'a trial court exercises discretion in its decision to exclude or admit evidence, [the] standard of review on appeal is whether the trial court committed an abuse of discretion that amounted to prejudicial error.' " *State v. Keller*, 2017-Ohio-2609, 90 N.E.3d 176, ¶ 6 (2d Dist.), quoting *State v. Cassel*, 2016-Ohio-3479, 66 N.E.3d 318, ¶ 13 (2d Dist.). (Other citations omitted.)

**{¶ 85}** In this case, even if Bresler's testimony were relevant to prove that Warren was unavoidably prevented from discovering the recantation evidence, Bresler's testimony still had no bearing on Warren's delay in filing his motion for leave to file a motion for new trial *after* he obtained Chante and Antonio's recantation affidavits. In other words, the fact that Chante and Antonio were adolescents when they testified and waited several years after Warren's trial to recant does not explain Warren's failure to present the recantation affidavits to the trial court within a reasonable time after he obtained them. Therefore, even if the trial court had abused its discretion in excluding relevant evidence of unavoidable delay, it does not change the fact that Warren failed to timely file his motion for leave. Accordingly, Warren has failed to demonstrate that any

prejudicial error resulted from the trial court's exclusion of Bresler's testimony.

{¶ 86} Warren's Second Assignment of Error is overruled.


**Third Assignment of Error**

{¶ 87} Warren's Third Assignment of Error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED

WARREN ACCESS TO PUBLIC RECORDS PURSUANT TO

R.C. §149.43(B)(8) AND SUBSEQUENTLY DENIED HIS MOTION FOR

DISCOVERY.     SEPT. 13, 2017 DECISION, ORDER AND ENTRY

OVERRULING MOTION FOR AN ORDER FINDING THAT DEFENDANT

IS ENTITLED TO PUBLIC RECORDS; R. C.149.43(B)(8); FOURTEENTH

AMENDMENT TO THE U.S. CONSTITUTION.

{¶ 88} Under his Third Assignment of Error, Warren contends that the trial court abused its discretion when it denied his motion for public records under R.C. 149.43(B)(8).    That statute generally sets forth the procedures governing disclosure of records maintained in a public office.    *Hall v. State*, 11th Dist. Trumbull No. 2008-T-0073, 2009-Ohio-404, ¶ 9.    Specifically, R.C. 149.43(B)(8) provides:

A public office or person responsible for public records is not required

to permit a person who is incarcerated pursuant to a criminal conviction or

a juvenile adjudication to inspect or to obtain a copy of any public record

concerning a criminal investigation or prosecution or concerning what would

be a criminal investigation or prosecution if the subject of the investigation

or prosecution were an adult, unless the request to inspect or to obtain a

copy of the record is for the purpose of acquiring information that is subject to release as a public record under this section and the judge who imposed the sentence or made the adjudication with respect to the person, or the judge's successor in office, finds that the information sought in the public record is necessary to support what appears to be a justiciable claim of the person.

R.C. 149.43(B)(8).

{¶ 89} "Through the passage of R.C. 149.43(B)(8), '[t]he General Assembly clearly evidenced a public-policy decision to restrict a convicted inmate's unlimited access to public records in order to conserve law enforcement resources.' " *State v. Rodriguez*, 12th Dist. Preble No. CA2013-11-011, 2014-Ohio-2583, ¶ 13, quoting *State ex rel. Russell v. Thornton*, 111 Ohio St.3d 409, 2006-Ohio-5858, ¶ 14. "To that end, 'R.C. 149.43(B)(8) requires an incarcerated criminal offender who seeks records relating to an inmate's criminal prosecution to obtain a finding by the sentencing judge or the judge's successor that the requested information is necessary to support what appears to be a justiciable claim.' " *Id.*, quoting *State ex rel. Fernbach v. Brush*, 133 Ohio St.3d 151, 2012-Ohio-4214, 976 N.E.2d 889, ¶ 2.

{¶ 90} For purposes of R.C. 149.43(B)(8), "[a] 'justiciable claim' is a claim properly brought before a court of justice for relief." *State v. Wilson*, 2d Dist. Montgomery No. 23734, 2011-Ohio-4195, ¶ 9. This court has consistently held that the justiciable claim requirement "ordinarily involves identifying a 'pending proceeding with respect to which the requested documents would be material.' " *State v. Wilson*, 2d Dist. Montgomery No. 23247, 2009-Ohio-7035, ¶ 5, quoting *State v. Gibson*, 2d Dist. Champaign No. 06-

CA-37, 2007-Ohio-7161, ¶ 14. *Accord State v. Atakpu*, 2d Dist. Montgomery No. 25232, 2013-Ohio-4392, ¶ 9. At least one court has disagreed, and held that R.C. 149.43(B)(8) does not require a justiciable claim to be pending, but only that the inmate has a justiciable claim to be advanced. *See State v. Askew*, 2017-Ohio-1512, 89 N.E.3d 55, ¶ 12 (11th Dist.).

**{¶ 91}** Regardless of that discrepancy, Warren's motion for public records sought "the records pertaining to the gunshot residue testing that was conducted on Warren after the shooting, as well as police investigatory records related to the death of [Simpson]." Motion for Public Records Pursuant to O.R.C. § 149.43(B)(8) (April 19, 2017), p. 2. All of those records existed before Warren's trial began and are records which Warren's defense counsel would have been provided in discovery. *See* Mont. Co. C.P.R. 3.03(B)(1)(a)-(f); *See also State v. Barber*, 2d Dist. Montgomery No. 13340, 1994 WL 47681, *8, fn. 1 (Feb. 16, 1994). Therefore, the requested records are not pieces of newly discovered evidence that Warren could have used to support a motion for new trial. The requested records also have absolutely no bearing on Warren's delay in filing his motion for leave to file a motion for new trial. As a result, the records were not material to the pending motion for leave to file a motion for new trial. Accordingly, the trial court's decision to overrule Warren's motion for public records was not an abuse of discretion.

**{¶ 92}** Warren's Third Assignment of Error is overruled.

## Conclusion

**{¶ 93}** Having overruled all of the assignments of error raised by Warren, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissents:

{¶ 94} I would reverse and allow Warren to file a motion for a new trial. At every turn, this record suggests counsel has failed Warren. On this record, I would conclude that Warren has adequately explained his reasons for the delay in seeking leave to file a motion for a new trial. His conviction rests partially upon discredited gunshot residue evidence and the testimony of two young teens who have recanted. "Those who claim wrongful conviction face nearly insurmountable procedural obstacles in attempting to prove their innocence." *State v. Bentley*, 2016-Ohio-3290, 66 N.E.3d 180, ¶ 19 (11th Dist.). As emphasized in *Bentley,* " '[n]o right of the victim is advanced, and no interest of the State served, by incarcerating the innocent.' " *Id.*, citing *State v. Aldridge*, 120 Ohio App.3d 122, 154, 697 N.E.2d 228 (2d Dist. 1997).

{¶ 95} Significantly, delays in seeking leave were occasioned by multiple failures of counsel, not Warren. Given the failure of several attorneys, we should not conclude that Warren's failure to file a pro se motion sooner was unreasonable. Warren was incarcerated at the age of 16. His pro se filings had been largely unsuccessful. The majority alludes to his pro se filings, including a January 9, 2002 motion for transcripts. This motion was denied on January 23, 2002. It was not a sophisticated motion and indeed Warren asserted he needed the transcripts to file his motion for new trial (based on one recantation affidavit). Nevertheless, he was not given access to the transcripts to file a new trial motion. In lieu of filing a motion for new trial, he reasonably focused his efforts on locating Antonio Johnson on advice of counsel, as well as pursuing other

postconviction relief.  Warren's reliance on the advice of seasoned defense attorneys explains and justifies the delayed filing herein.

**{¶ 96}** Applying a case-specific reasonableness analysis, the trial court should have found " 'the delay was reasonable under the circumstances' " and Warren had " 'adequately explained the reason for the delay.' "  *State v. Howard*, 2016-Ohio-504, 59 N.E.3d 685, ¶ 50 (2d Dist.), quoting *State v. Woodward*, 10th Dist. Franklin No. 08AP-1015, 2009-Ohio-4213, ¶ 15. A plethora of cases support this fact-specific analysis.  *See State v. McConnell*, 2d Dist. Montgomery No. 24315, 2011-Ohio-5555, ¶ 15; *State v. Clark*, 2d Dist. Montgomery No. 26596, 2016-Ohio-39, ¶ 29; *Bentley* at ¶ 15-20; *State v. Thomas*, 2017-Ohio-4403, 93 N.E.3d 227, ¶ 8-9 (1st Dist.).

**{¶ 97}** The affidavits of the two juvenile witnesses, along with the discredited gunshot residue evidence, at the very least "disclose[ ] a strong probability that it will change the result if a new trial is granted."  *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.   I recognize we have repeatedly stated that evidence which recants testimony given at trial is " 'looked upon with the utmost suspicion.' "  *State v. Rossi*, 2d Dist. Montgomery No. 24740, 2012-Ohio-2545, ¶ 17, quoting *State v. Isham*, 2d Dist. Montgomery No. 15976, 1997 WL 24794 (Jan. 24, 1997).  This is "because, 'where a witness makes subsequent statements directly contradicting earlier testimony the witness is either lying, now, was lying then, or lied both times.' "  *United States v. Earles*, 983 F.Supp. 1236, 1248 (N.D. Iowa 1997), quoting *United States v. Provost,* 969 F.2d 617, 620 (8th Cir.1992).

**{¶ 98}** Accordingly, in my view a confluence of factors — poor lawyers, recanted testimony of children (whose vulnerabilities are well recognized in law), and disputed

firearm evidence — present a real risk Warren's conviction may have been unjust.   At a minimum, the motion for new trial warranted a merit determination and was timely filed under the circumstances.   I would reverse.

Copies sent to:

Mathias H. Heck, Jr.
Michele D. Phipps
Joanna L. Sanchez
Patrick T. Clark
Hon. Mary Katherine Huffman